## SARGENT BARGE LINE, Inc. v. THE OVERBROOK et al.

## REFINED SYRUPS & SUGARS, Inc. v. THE WILLIAM T. ROUSE et al. THE TRENTON.

### Nos. 18236, 18502.

United States District Court
E. D. New York.

May 8, 1950.

Mahar & Mason, New York City, proctors for Sargent Barge Line, Inc., by Frank C. Mason, New York City, advocate.

Macklin, Speer, Hanan & McKernan, New York City, proctors for Refined Syrups & Sugars, Inc., by Charles J. Carroll, Jr., New York City, advocate.

Burlinham, Veeder, Clark & Hupper, New York City, proctors for tugs Overbrook and Trenton and Pennsylvania R. Co., by Frederic Conger, New York City, advocate.

INCH, District Judge.

These two actions arise out of the sinking of the barge William T. Rouse (hereinafter called "The Rouse"), with its cargo of pulverized coal, while moored at the 58th Street pier in the North River, at about 11 A.M. on August 6, 1946. One suit is by Sargent Barge Line, Inc. (hereinafter called "Sargent"), as owner of The Rouse, against the tugs Overbrook and Trenton, for damage to the barge caused by the sinking, the salvage expense in raising her, and for loss of the barge master's personal effects. The other suit is by Refined Syrups & Sugars, Inc. (hereinafter called the "Sugar Company") as owner of the cargo of coal against Sargent, the barge Rouse and the tugs Overbrook and Trenton, for loss and damage to the coal cargo. By stipulation both actions were tried together.

On August 5, 1946 The Rouse, having a capacity of 1,000 tons, was loaded at South Amboy, N. J., with 985 tons of soft, dust coal consigned to the Sugar Company in Yonkers, N. Y. After the loading was completed the bargee sounded and found that the barge had ten inches of water, all of which he pumped out except two inches which his pumps could not reach. The barge had a freeboard of about twelve inches amidships and about eighteen inches at bow and stern. It was then placed in the Pennsylvania Railroad Company's big tow of loaded barges and proceeded toward New York. Upon arrival off Bayonne, N. J., the

next morning, August 6, at about 4:30 A.M., The Rouse was taken out of the main tow, together with the loaded barge Liberty Bell, by the tug Overbrook. The Overbrook proceeded toward New York ahead of the main tow, with The Liberty Bell on her port side and The Rouse on her starboard side, the bows of all three heading in the same direction. Coming out of the Kills the bargee ran his pumps for about an hour and got a little water "here and there". The weather was clear and calm, and from 6:45 A.M. to 9:30 A.M. the tide was ebb in the North River from the Battery to 58th Street. At about 6:45 A.M. in the vicinity of Pier D, Jersey City, the tug Trenton joined the tow making fast to the starboard side of The Rouse. A little further up, in the vicinity of Pier 9, Jersey City, the tug J. P. McAllister joined the tow making fast to the port side of The Liberty Bell. The three tugs, with the two loaded barges between them, then proceeded up the North River against the ebb tide at about one and one-half miles per hour until they reached 54th Street, Manhattan, where The J. P. McAllister left the tow. The Trenton dropped off at 58th Street at about 9:30 A.M., then The Overbrook placed The Rouse, with The Liberty Bell outside her, on the north side of the 58th Street pier, bow in toward the bulkhead and starboard side next to the pier.

The bargee of The Rouse sounded his barge and found only four inches of water which he did not consider enough to require pumping at that time. The barge appeared to be on an even keel and apparently safe, and the bargee went ashore to telephone his owner that he was ready to be towed to Yonkers. On returning to the barge, a half hour later, he found it listing to starboard at an angle of about 15 degrees. He immediately started his starboard pump, but got no water because, it is claimed, the water had been absorbed by the cargo of dust coal. At about 11 A.M. The Rouse rolled over on its starboard side and sank.

A few days later the barge was raised by means of a derrick with slings. It was taken to New Jersey and inspected and then without repairs, proceeded to Yonkers where it delivered what remained of its coal cargo.

A survey of The Rouse held on September 10, 1946, showed that on the starboard side a covering board was broken at the edge and that the top log seam, which is about sixteen inches below the surface of the deck, was open from the stern to amidships. The open seam was caused, as one of the surveyors described it, by the top log having been "lifted or tilted".

In its libel Sargent alleged that this damage to The Rouse was caused by the negligence of the tugs Overbrook and Trenton in towing the barge up the North River. In my judgment Sargent has sustained the burden of proof on that issue.

There is ample evidence that The Rouse was seaworthy immediately prior to the towage. In September and October of 1944, the barge was completely overhauled at a cost in excess of $12,500. Then in November of 1945, nine months prior to the sinking, $236 was spent on work on the barge, including the caulking of the three seams from the cover board down for the entire length of the barge on both sides. The superintendent of the company which did the work testified that the life of the oakum used would be two or three years, and that its condition in August 1946 would be "fairly good". Finally, in January and February of 1946, certain bow damage was repaired on The Rouse at a cost of more than $3,000, and the superintendent of that company testified that the barge was in a seaworthy condition and required no other repairs. Thus for a period of less than two years prior to the sinking more than $16,-000 was spent on The Rouse. Further, all the witnesses who supervised work on the boat, or surveyed it, both before and after the sinking, were unanimous in their opinion that the barge was in good condition.

The proof shows that The Trenton made fast to The Rouse opposite the barge's starboard after quarter cleat, where the open seam was later found. At this point of contact The Trenton had a freeboard of five to six feet, whereas the heavily loaded barge had a freeboard of only eighteen inches, so that the strap from the portside bitts of

The Trenton came down at a considerable angle to the starboard after quarter cleat of The Rouse. Now The Trenton was equipped with heavy iron steel guards or ribs along her sides, and the evidence supports a finding that The Trenton was not equipped with fenders of sufficient length and thickness to have prevented her from pounding against the barge and damaging it in the three-hour tow up the North River against the ebb tide. It is admitted that all during that time, while The Rouse was wedged between The Overbrook and The Trenton, the tugs kept their engines full ahead. Moreover, The Trenton carried no stern line to the tow so that it was necessary for her wheel to be held to the right, exerting additional pressure on The Rouse. I am, therefore, inclined to believe the testimony of the barge captain to the effect that in going up the river, where the water was somewhat rough because of ferry boats and other boats, that The Trenton, with its heavy steel ribs and without adequate fenders, rolled and pounded against The Rouse which was held in on the opposite side by The Overbrook, thus causing the damage claimed.

I cannot find that the sinking of The Rouse resulted from any of the causes suggested by the tug interests. First, it is claimed that the barge was overloaded and that the oakum in its seams was old and dried out. As already stated, the proof shows the barge was entirely seaworthy. It had a capacity of 1,000 tons, and there is evidence that on several occasions it had carried more than 985 tons. Had the condition of The Rouse been such as is claimed by the tug owners, I do not believe it could have been towed all through the night from South Amboy, N. J. and arrived in Manhattan on an even keel and with no change in its low freeboard.

Nor do I find that the damage was caused either by the barge striking the pier when it capsized, or in the salvage operations of raising her with slings. The only damage found which could have caused the sinking was the opened log seam, so that the damage must have existed prior to the sinking. Moreover, there is no direct evidence that the barge struck the pier and there is no showing of opened seams at any other place on the barge other than at the point where The Trenton made fast.

The bargee cannot be said to have been negligent. The damage was not readily discoverable and the barge appeared to be in good and undamaged condition to all concerned when it arrived at 58th Street. Finding only four inches of water in his boat at that time, the bargee was justified in going ashore for a short time to notify his employer of his safe arrival.

I find The Overbrook equally at fault with The Trenton in view of the fact that she was in charge of the tow and should not have permitted The Trenton to make up on the opposite side of The Rouse and continue there equipped as she was and under the circumstances here presented.

Libellants Sargent and the Sugar Company are each entitled to a decree against the tugs Overbrook and Trenton for their respective damages, with interest and costs, and the Sugar Company's libel against Sargent and The Rouse should be dismissed without costs.

### Findings of Fact

1. At all the times mentioned in the libels, Sargent Barge Line, Inc., was a New York corporation and the owner of the barge William T. Rouse; Refined Syrups & Sugars, Inc., was a New York corporation and the owner of the cargo of bituminous coal laden on the said barge and aboard her on August 6, 1946; The Pennsylvania Railroad Company was a Pennsylvania corporation and the owner and operator of the tugs Overbrook and Trenton.

2. The William T. Rouse was 115.6 feet long, 28 feet beam and 15 feet height of sides; the Overbrook was 104.2 feet long, 24.4 feet beam and 11.2 feet deep and the Trenton was 97.7 feet long, 24.1 feet beam and 12.2 feet deep.

3. Up to the time of the towage described herein The William T. Rouse was tight, staunch and seaworthy, having been thoroughly overhauled less than two years prior hereto at a cost of about $12,750, and having been caulked and otherwise repaired about her topsides in November 1945. She

also was repaired in January and February 1946 for a bow damage, and at that time, as well as when repaired in November 1945, was in such condition that no other repairs were required to make her seaworthy and capable of carrying coal cargoes to her rated capacity of 1000 tons.

4. The cargo of coal, laden on the barge, was being carried, pursuant to a contract between Sargent Barge Line, Inc., and Refined Syrups & Sugars, Inc., from South Amboy, N. J., to Yonkers, N. Y.

5. Up to the time of this towage the cargo on The William T. Rouse, consisting of 985 tons of powdered bituminous coal was in good condition.

6. The bargee of The William T. Rouse had on board her at such time personal effects which were his own property.

7. The William T. Rouse was loaded with her cargo at South Amboy, N. J. and sometime during the day of August 5, 1946 she and a number of other barges left South Amboy in tow of Pennsylvania Railroad tugs, of which The Overbrook was one; in the vicinity of Bayonne, N. J. The Overbrook removed from the flotilla tow, the barges William T. Rouse and Liberty Bell, the latter barge also having on board a cargo of coal.

8. The William T. Rouse, which had a freeboard amidships of about one foot and at the starboard side aft of about one and one-half feet, was towed on The Overbrook's starboard side, while The Liberty Bell was towed on the tug's port side.

9. The weather was clear and calm, and at about 6:45 A.M. and until about 9:30 A.M. the tide was ebb in the North River between the Battery and 58th Street.

10. When the tow was in the vicinity of Pier D, Jersey City, the tug Trenton joined the tow, by making fast to The Rouse's starboard side and remaining there until the tow reached 58th Street, where she left as The Overbrook proceeded to place the barges in the slip on the north side of the pier; the tug J. P. McAllister joined the tow in the vicinity of Pier 9, Jersey City, making fast to the port side of The Liberty Bell, and she left the tow in the vicinity of 54th Street, Manhattan.

11. The Trenton had a six inch strap from her port side bitts to the starboard stern quarter cleat of the barge and a headline from her stem head to the barge's starboard bow quarter cleat, but she carried no stern line from her after end to the tow, necessitating the holding over of her wheel and rudder to the right to hold the tug's port side forward in against the starboard after side of the barge just forward of the starboard stern quarter cleat.

12. During the towage, with The Trenton alongside, the engines of The Overbrook and Trenton were kept full ahead, with The Overbrook exerting its starboard side against The Rouse's port side and The Trenton its port side forward against the starboard side aft of the barge so that it was subjected to opposing forces during a period of almost three hours.

13. The Trenton's freeboard, at the point opposite the starboard after quarter cleat of The Rouse, was about five feet while the barge at that point had a freeboard of about eighteen inches, so that the towing strap led down from the tug's side bitts at a considerable angle to barge's cleat, thus creating greater strain at that area.

14. While there was little or no wind the water surface in the North River was roughened by passing ferryboats and other traffic in those hours, and as a result The Trenton was caused and allowed to pitch and roll heavily against the low sided barge.

15. The Trenton, although higher than The Rouse and constructed with heavy iron half round guards along her sides, was not equipped with fenders of sufficient length and thickness to protect the wooden barge from damage during the pitching and rolling of the tug's iron guards on the covering board and top log of the barge.

16. The barge sustained a broken covering board and lifted top log at the starboard side, forward of the after quarter cleat, and her seam was opened up by the displacement of the top log from its normal position, thus permitting water to enter through the seam and find its way into the cargo of powdered fuel.

17. Upon arrival at 58th Street, the captain of The Rouse sounded his barge at the

stern and found only four inches of water there, two inches more than that at which the pump sucks air when in operation; this quantity of water was not unusual for normal conditions and the captain did not deem it necessary to start his pump then. The barge at that time was on an even keel and apparently safe.

18. As the barge was finally destined to Yonkers, N. Y. the bargee left her to report his arrival at 58th Street to his employer by telephone.

19. The bargee left the barge at about 9:30 A.M. and returned in about one half hour when he found her listed to starboard, toward the pier, at an angle of about fifteen degrees.

20. At 11 A.M. the barge rolled over on her starboard side and sank.

21. The barge master had had no indication nor reason to suspect, after his first sounding upon arrival at 58th Street, that the barge was in other than good and undamaged condition.

22. The contacts of The Trenton, as she pressed and rolled against The Rouse, caused the sinking and consequent loss and damage to the barge, her cargo of coal and the captain's personal effects.

23. Such damage was not caused by (1) overloading and dried out seams, (2) the slinging operations of the salvors, or (3) by contact with the dock as the barge sank, there being no credible proof to support those theories.

### Conclusions of Law.

1. The tug Overbrook was the main tug in charge of the tow and, as such was responsible for the makeup of the tow.

2. The Overbrook was chargeable with the duty of seeing that the barge was towed with lines so placed and the tow so arranged that damage would not be caused to the barge William T. Rouse.

3. The position of The Trenton alongside The Rouse was likely to cause damage, and it was The Overbrook's duty to take appropriate steps to prevent pounding and damage to the barge.

4. The Trenton was at fault in failing to be equipped, while alongside The Rouse, with fenders of sufficient length and thickness, and thus allowing herself to pound heavily against the barge's starboard afterside, causing damage thereto.

5. The leakage, which developed in the barge, was not readily discoverable by her bargee who was justified, after arrival and sounding of four inches at the stern, in leaving the barge for a short time on his owner's business.

6. The proximate cause of the sinking was the negligence of the tugs in the respects hereinbefore stated and there was no intervening negligence on the part of the bargee.

7. Libellant, Sargent Barge Line, Inc., is entitled to a decree for full damages, with interest and costs against the tugs Overbrook and Trenton.

8. Libellant, Refined Syrups & Sugars, Inc., is entitled to a decree for full damages with interest and costs against the tugs Overbrook and Trenton and its libel should be dismissed, without costs, as against Sargent Barge Line, Inc., and the barge William T. Rouse.

Settle decree on notice.